UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NO. 08-80039-CIV-MARRA/JOHNSON

J. WILLIAM STEFAN,

      Plaintiffs,

v.

SINGER ISLAND CONDOMINIUMS
LTD., a Florida limited partnership, and
DEVELOPMENT INVESTORS GP, LLC,
a Florida limited liability company

      Defendants.

_____

## OPINION AND ORDER ON MOTION TO DISMISS

THIS CAUSE comes before the Court on Defendants' Singer Island Condominiums Ltd.

("SIC") and Development Investors GP, LLC ("Development Investors") (collectively,

"Defendants")'s Motion to Dismiss Plaintiff's Amended Complaint (DE 17).  The motion is now

fully briefed and ripe for review.  The Court has carefully considered the motion, response, and

reply and is otherwise fully advised in the premises.

**Background**

On January 16, 2008, Plaintiff filed his Complaint against Defendants, which was

replaced on April 18, 2008 by an Amended Complaint (DE 14).  The Amended Complaint

alleges a violation of the Interstate Land Sales Full Disclosure Act ("ILSA"), 15 U.S.C. § 1701 *et*

*seq.* (Count I), as well as violations of Florida Statute Chapter 718 (Count II), a violation of

Chapter 501, Florida Statute, Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"),

and a claim for fraud in the inducement (Count IV).

The facts, as alleged in the Amended Complaint, are as follows: on or about May 30, 2005, Plaintiff executed a contract ("the Initial Contract") for the purchase of a condominium unit to be built by SIC in a condominium resort known as 2700 North Ocean ("the community") (Am. Compl. ¶ ¶ 7,9.)  Plaintiff alleges that 2700 North Ocean is a "subdivision" and Defendants collectively constitute a "developer" as defined by the ILSA.  (Am. Compl. ¶¶ 7,8.) Plaintiff claims that he paid two deposits totaling $205,100.00 to Defendants. (Am. Compl. ¶10.)

Plaintiff claims that on June 20, 2005, Defendants sent Plaintiff a letter delivering "important documents relating to your purchase, some of which require your signature and must be returned to us no later than July 8, 2005." (Am. Compl. ¶ 11.).  Plaintiff attached a copy of the June 25, 2005 letter ("the letter") to the Amended Complaint (Am. Compl. Exh. B).  The letter states, in part:

> In connection with our securing construction financing to complete the buildings, our lenders are requiring that we have each purchaser reconfirm his or her interest in our great development, by having each purchaser execute a replacement purchase agreement which conforms to the Federal Government's standards for HUD.  As you will note, you have still locked in your preconstruction purchase price.  We have included a "redline copy" of the Purchase Agreement which identifies changes made within the text of the agreement.  The first change you will notice is that we *no longer require a third deposit*.  Only a 20% deposit is now required.  **These agreements, together with the receipt of these documents must be returned and received by us no later than July 8th, 2005.**  A return Federal Express envelope is enclosed for your convenience.
>
> Also included with this letter is information as to the improvements we made to the buildings' design and amenity features.  Over the past several months, our architectural and creative design team has been hard at work finalizing the plans.  The improvements come as part of our commitment as we strive to achieve excellence.  Please review these changes.  You will find them enclosed and labeled "Declaration of Condominium Document changes."  Should you find the

changes material in a manor [sic] which is adverse to you, you may elect to cancel your agreement by providing us notice of cancellation within 15 days following the date of this letter.  I am confident, though, you will consider these changes enhance the property, as we do.

(Am. Compl. Exh. B, Am. Compl. ¶ 11-14 ) (emphasis in original).

Plaintiff executed the Revised Contract and returned it to Defendants.  (Am. Compl. ¶ 11.).  Plaintiff alleges that the main distinction between the two contracts is that the Initial Contract was prepared to be exempt from the ILSA, in particular section 1702(a)(2), but the Revised Contract was not.  (Am. Compl. ¶ 16.)

Plaintiff claims that "Defendants utilized a specific manner, style, format and sequence in drafting and presenting the Contracts to evade compliance with the ILSA and deceive Plaintiff. (Am. Compl. ¶ 23.) .  Plaintiff further claims that Defendants' promise in the Initial Contract to complete within two years "is only facially compliant and it is undermined by other provisions which impose conditions on the obligation and that limit a Buyer's remedies in a manner which renders the promise . . . illusory." (Am. Compl. ¶ 31.) The Initial Contract provides, in pertinent part:

> 7. <u>Completion Date: Presale Contingency.</u> Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement by a date no later than two (2) years from the date Buyer signs this Agreement, subject, however, only to delays caused by matters which are legally recognized as defenses to contract actions in the jurisdiction where the Building is being erected (the "Outside Date").
> . . .
> 9.  <u>Closing date.</u> Buyer understands and agrees that Seller has the right to schedule the date, time and place for closing.  Closing does not have to be scheduled within two (2) years of the date of Buyer's execution of this Agreement, but Seller agrees that closing shall be scheduled no later than six (6) months following the Outside Date.

Before Seller can require Buyer to close, however, two things must be done:

(a)    Seller must record the Declaration and related documents in the Palm Beach County public records; and

(b)    Seller must obtain a temporary, partial or permanent certificate of occupancy for or covering the Unit from the proper governmental agency (a certificate of occupancy is the official approval needed before a unit may be lived in) but, subject and subordinate to the provisions of Sections 8 and 33 of this Agreement (without limiting the generality of those provisions by this specific reference), the Common Elements and/or other portions of the Condominium Property need not then have certificates of occupancy, nor be completed, provided, however, that the certification of substantial completion described in Section 718.104(4)(e), Florida Statutes, shall be included as an exhibit to the Declaration, as recorded.
. . .
10. Closing.    . . .
If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (at least sixty (60) days) to correct any defects in title.  If Seller cannot, after making reasonable efforts to do so (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments) correct the title defects, Buyer will have two options:
a. Buyer can accept title in the condition Seller offers it (with defects) and pay the full Purchase Price for the Unit with exceptions for such title matters to be contained in the special warranty deed for the Unit.  Buyer will not make any claims against Seller because of the defects; or
b. Buyer can cancel this Agreement and receive a full refund of Buyer's deposits.  Seller will be relieved of all obligations under this Agreement (and otherwise) when Seller refunds the deposits to Buyer.

(Am. Compl. Exh. A).

Plaintiff further claims that, at the time Defendants presented the Initial Contract to him, they did not intend to comply with its promise to complete within two years, "but merely used that form of agreement to evade the requirement of the Act" and to get Plaintiff committed to the purchase  (Am. Compl. ¶ 30, 35, 36.)  Plaintiff alleges that the Contracts were used as a scheme to fraudulently induce Plaintiff and other purchasers by using the Initial Contract solely for the purpose of evading the Act at a time when they knew the project was being registered with HUD and that purchasers would later be required to execute the Revised Contract. (Am. Compl. ¶ 32.)

4

Plaintiff alleges that Defendants had applied for and received HUD's registration approval one week before the Initial Contract had been signed by him.  (Am. Compl. ¶ 33, 48.)  Plaintiff further contends that, upon receiving HUD approval, Defendants did not intend to be bound by the Initial Contract's promise to complete within two years. (Am. Compl. ¶ 34.). Plaintiff claims Defendants did not provide a printed property report. (Am. Compl. ¶ 37.).  Plaintiff alleges that Defendants' use of the Initial Contract was intended to be a "stop gap measure" so they could sell units without providing a report before the contract was executed. (Am. Compl. ¶ 48.)  Plaintiff alleges that Defendants misled him by failing to advise him that the claimed requirement by Defendants' lender, of the need to obtain replacement contracts, was known to Defendants before they initially contracted with Plaintiff.  Plaintiff further asserts that  Defendants falsely cast the alleged need for a replacement contract as though the lender's request occurred after the Initial Contract had been signed. (Am. Compl. ¶ 48.)  Plaintiff alleges that had he been told the truth, he would not have proceeded with the transaction. (Am. Compl. ¶ 48.)  Plaintiff also claims that the transmittal letter accompanying the Revised Contract indicated the purchaser was required to modify the contract to conform to law as a condition of construction lending; however, the Initial Contract was not contingent on Defendants' obtaining such financing. (Am. Compl. ¶ 48.)

Plaintiff further alleges that the Revised contract does not allow a purchaser twenty (20) days to cure a default from the date a written notice of default is received, but instead only allows twenty days from the day notice to cure is sent.  Plaintiff claims this is a  violation of § 1703(d) of the ILSA. (Am. Compl. ¶ 49.) Plaintiff also claims that the contracts include both fraudulent and misleading statements with regard to the cost of title insurance in violation of § 1703(a)(2)(A) and (C) of the ILSA.  (Am. Compl. ¶ 49.)

5

Additionally, Plaintiff contends that Paragraphs 11 of both Contracts, regarding closing costs and title insurance, are intentionally ambiguous and misleading, in violation of Fl. Stat. § 713.506. (Am. Compl. ¶ 54.)  This paragraph states, in pertinent part:

> 11. <u>Additional Costs and Development Fee.</u> Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing.  These include:
>
> (a)     A "development fee" equal to one and one half percent (1.50%) of the Purchase Price (and of any changes for options or extras now or hereafter contracted for which are not included in the Purchase Price).  This fee will be used, in part, to pay for the following closing costs: . . . (iii) the premium on the owner's title insurance policy, at the minium promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home credits, if any), whether obtained from Seller's closing agent, or elsewhere.  The balance of the "development fee" shall be retained by Seller to provide additional revenue and to offset certain of its construction and development expenses . . .

(Am. Compl. Exh. A and C).  Plaintiff alleges that Paragraph 11 intentionally inhibits the Buyer from seeking title insurance at a lower cost because it implies the title insurance will be provided at the minimum rate promulgated by law. (Am. Compl. ¶ 56). Plaintiff also alleges that this paragraph inhibits a buyer from seeking title insurance at a lower cost because any savings will inure to Defendants.  (Am. Compl. ¶ 57). Plaintiff asserts that there is no "minimum rate" promulgated by law.  (Am. Compl. ¶ 58).  Plaintiff further asserts that, through Defendants' affiliated business, Defendants' customers are charged more than the cost of the policy, rendering Defendants' representation false.  (Am. Compl. ¶ 62).  Additionally, Plaintiff alleges that at all times Defendants knew this representation was material and false.  (Am. Compl. ¶ 63).  Plaintiff asserts that Defendants have agreed among themselves and with their affiliated title company to make representations to customers and/or respond to inquiries from customers in a manner

intended to lead them to believe that they are required to charge purchasers no less than the promulgated rate and that the promulgated rate represents cost.  (Am. Compl. ¶ 65)

Plaintiff further claims that Defendants did not provide Plaintiff with a copy of the management contract until October, 2007, nor did Defendants provide the information pertinent thereto.  (Am. Compl. ¶ 71).  Plaintiff alleges that the management contract was prejudicial to him and that, pursuant to Fla. Stat. § 718.503, he was allowed to cancel the contract within fifteen (15) days of its delivery.

In Count I, Plaintiff seeks a declaration that both contracts are: (1) not exempt from, and are in violation of, the requirements of the ILSA and (2) are illegal and void.  In Count II, Plaintiff seeks damages, restitution and other relief under Fla. Stat. §§ 718.503, 718.504 and 718.506.  In Count III, Plaintiff seeks a declaration that Defendants violated the FDUTPA, injunctive and other relief under Fla. Stat. § 501.211.  In Count IV, Plaintiff seeks rescission of both contracts, damages and restitution.

Defendants move to dismiss the Amended Complaint.  Defendants claim that the ILSA claims in Count I are time-barred.  Notwithstanding the statute of limitations, Defendants argue that the Initial Contract's two-year completion provision was not illusory.  Moreover, Defendants claim the terms of the Initial Contract are irrelevant in this action because the Initial Contract was abrogated and extinguished through the merger clause in the Revised Contract.

As to Plaintiff's claims in Count II, Defendants argue that they fail to state a cause of action under Fla. Stat. 718.506.  Defendants assert that Plaintiff has failed to allege any materially false or misleading statements in the prospectus or the June 2005 letter that are not negated by the clear terms of the Revised Contract.  Defendants also assert that Plaintiff

misconstrues the law regarding "minimum promulgated risk rates" for title insurance. Defendants argue that the execution of the management contract was not a material and adverse change that would allow Plaintiff to rescind the contract within fifteen days.

Additionally, Defendants contend that Plaintiff fails to state a cause of action in Count III under FDUTPA.  Defendants argue, as a matter of law, that the reference to the minimum promulgated risk rate premium is neither misleading nor deceptive and that it complies with Florida's insurance regulations.  Furthermore, Defendants argue that Plaintiff has not alleged that he relied on the allegedly misleading statement in signing the Agreement.

As to Plaintiff's fraudulent inducement claim in Count IV, Defendants argue that the terms of the contracts and the June 2005 letter clearly contradict the claim.  Defendants also argue that Plaintiff's alleged reliance on the terms of the Initial Contract is negated by Plaintiff's subsequent execution of the Revised Contract.

**Standard of Review**

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon which it rests."  Fed. R. Civ. P. 8(a).  The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted).  When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in

determining whether a plaintiff has stated a claim for which relief could be granted.  Hishon v. King & Spalding, 467 U.S. 69, 73 (1984).

**Discussion**

*Count 1: The ILSA*

The ILSA "is an antifraud statute utilizing disclosure as its primary tool" to "protect purchasers from unscrupulous sales of undeveloped home sites."  Winter v. Hollingsworth Properties, Inc., 777 F.2d 1444, 1446-47 (11th Cir. 1985). Federal law governs the interpretation of the ILSA, a federal statute.  Sola Electric Co. v. Jefferson Electric Co., 317 U.S. 173, 176 (1942).

(i). § 1703(a)(1)(B) - Initial Contract

The Amended Complaint seeks declaratory relief as to whether the Initial Contract is exempt from the ISLA under § 1702(a)(2).  Plaintiff alleges that Defendants did not provide him a property report prior to signing the Initial Contract, in violation of § 1703(a)(1)(B) of the ILSA. (Am. Compl. ¶ 37.).

The ILSA prohibits any developer from making use of interstate commerce to sell or lease property unless a property report (as statutorily defined) is furnished to the purchaser. 15 U.S.C. § 1703(a)(1)(B).  However, sales of "improved land on which there is a residential, commercial, condominium, or industrial building, or the sale or lease of land under a *contract obligating the seller or lessor to erect such a building thereon within a period of two years*" are exempt from the ILSA's coverage.  15 U.S.C. § 1702(a)(2) (emphasis added).

The Department of Housing and Urban Development ("HUD") has provided some guidance as to the meaning of the word "obligate."  In essence, "[t]he contract must not allow

9

nonperformance by the seller at the seller's discretion." Guidelines for Exemptions Available

Under the Interstate Land Sales Full Disclosure Act, 61 Fed. Reg. 13596, 13603 (Mar. 27, 1996)

[hereinafter, Guidelines]. The Guidelines also state that "[c]ontract provisions which allow for

nonperformance or for delays of construction completion beyond the two-year period are

acceptable if such provisions are legally recognized as defenses to contract actions in the

jurisdiction where the building is being erected." Specifically, the Guidelines state that "time

extensions for events or occurrences such as acts of God, casualty losses or material shortages are

generally permissible." Id.

While the HUD Guidelines are to be given "great deference," Winter, 777 F.2d at 1448,

whether a contract "obliges" the seller to erect a building within two years is ultimately a

question of state contract law. Markowitz v. Northeast Land Co., 906 F.2d 100, 105 (3d Cir.

1990); Guidelines, 61 Fed. Reg. at 13603. In addressing the ILSA, the Florida Supreme Court

has stated that "the obligation [to build within two years] must be unrestricted and the contract

must not limit the purchaser's right to seek specific performance *or* damages." Samara

Development Corp. v. Marlow, 556 So. 2d 1097, 1100 (Fla. 1990); see also Kamel v. Kenco/The

Oaks at Boca Raton, LP, No. 07-80905, 2008 U.S. Dist. LEXIS 42467 (S.D. Fla. May 29, 2008);

Aboujaoude v. Poinciana Development Co. II, 509 F. Supp. 2d 1266, 1272 (S.D. Fla. 2007)

(holding that language limiting a buyer's remedy to return of the deposit money eliminates the

buyer's ability to enforce the promise to construct the building within two years); Dorchester

Development, Inc. v. Burk, 439 So. 2d 1032, 1034 (Fla. 3d DCA 1983) ("Where the seller is

obligated to complete by a certain time, the purchaser is not limited . . . to the remedy of

rescission, but he may affirm the contract and seek damages."). Likewise, the Guidelines state

10

that "contracts that directly or indirectly waive the buyer's right to specific performance are treated as lacking a realistic obligation to construct." Guidelines, 61 Fed. Reg. at 13603.

Plaintiff admits that the Initial Contract states that a purchaser may seek all remedies at law and equity. (Am. Compl. ¶ 48b). A plain reading of this statement would indicate that Plaintiff's remedies for breach of the contract (including the promise to complete construction within two years) are not limited. Mihalyi v. Shelby Homes at Lantana, LC, Slip Copy, 2008 WL 2520481 (S.D. Fla. 2008). Plaintiff, however, argues that the Initial Contract does not qualify for the § 1702(a)(2) exemption for the following three reasons: (1) paragraph 7 places limitations on Plaintiff's remedies with respect to the completion date; (2) paragraph 9(b) renders the promise to complete only a partial promise in that it exculpates Defendants from the obligation to complete the common areas; and (3) paragraph 10(b) further qualifies the obligation to complete in the event of a title defect. The Court addresses each argument in turn.

Plaintiff contends that paragraph 7 limits Plaintiff's remedies with respect to the completion date, rendering the promise to build within two years conditional and equivocal. (Am. Compl. ¶ 48a). That paragraph reads as follows:

> 7. Completion Date: Presale Contingency. Seller agrees to substantially complete construction of the Unit, in the manner specified in this Agreement by a date no later than two (2) years from the date Buyer signs this Agreement, subject, however, only to delays caused by matters which are legally recognized as defenses to contract actions in the jurisdiction where the Building is being erected (the "Outside Date").

Plaintiff claims that this *force majeure* clause nullifies the exemption because it would include certain foreseeable excuses (i.e., shortages of material and labor). However, this Court has held that a developer may place conditions which are legally recognized as defenses on the

obligation to build and still qualify for the statutory exemption. See, e.g., Kamel, 2008 WL 2245831. As the Guidelines contemplate, paragraph 7 bases its grounds for nonperformance or delay on those "legally recognized as defenses to contract actions in the jurisdiction where the building is being erected."61 Fed. Reg. 13596, 13603.  Accordingly, the *force majeure* clause does not render the promise to complete within two years illusory.

Plaintiff claims that paragraph 9(b)[1] exculpates Defendants from the obligation to complete the common areas, thus excluding the property from the exemption.  A Florida court recently rejected the identical argument. See Fallarco v. The Edge Investors, L.P., Case No. 2007-CA-005869-AA (Fla. 15th Cir. Feb. 25, 2008).

> Plaintiff's assertion that the contracts must also assure completion of all common areas and amenities does not appear to be supported by the Act or by the HUD Guidelines interpreting the Act.  The Guidelines provide that for a building or unit to be considered complete it must be physically habitable and usable for the purpose for which it was purchased.  For a residential unit, this means that the unit is ready for occupancy and has all 'necessary and customary utilities extended to it.

Id. at 2-3.  This Court agrees with the reasoning of the state court.

Plaintiff claims that paragraph 10(b), "A Special Warranty Deed," renders the promise to complete meaningless because it qualifies the obligation to complete in the event of a title defect. The Court rejects this argument.  The 15 U.S.C. § 1702(a)(2) exemption requires the seller to "erect" the building within two years and has nothing to do with the quality of title.  In addition, the paragraph at issue clearly allows the buyer to rescind the contract if the seller cannot provide

---

[1] Paragraph 9(b) states, in part, that before closing, "the Common Elements and/or other portions of the Condominium Property need not then have certificates of occupancy, nor be completed, provided, however, that the certification of substantial completion described in Section 718.104(4)(e), Florida Statutes, shall be included as an exhibit to the Declaration, as recorded."

the quality of title described in the contract within a reasonable period of time.

Moreover, the Initial Contract contains a severability clause. This clause renders void any language in the contract that restricts the obligation to build within two years. See Paragraph 13 of the Initial Contract.[2] Clearly, Defendant intended that the Initial Contract meet the requirements of the two-year exemption.

Accordingly, reading the Initial Contract as a whole and giving all language effect, see Cane Growers Co-op. of Florida, Inc. v. Pinnock, 735 So.2d 530 (4th DCA 1999), the Court holds, as a matter of law, that the Initial Contract is exempt from the ILSA under 15 U.S.C. § 1702(a)(2). Defendant was not obligated to provide a property report pursuant to § 1703(a)(1)(B) prior to Plaintiff signing the Initial Contract. Plaintiff's claim in Count I that the Initial Contract violated § 1703(a)(1)(B) is hereby **DISMISSED WITH PREJUDICE.**[3]

(ii). 1703(d)(2) - Initial Contract

Count I of the Amended Complaint also seeks declaratory relief as to the Initial Contract's alleged failure to comply with the requirements set forth in § 1703(d)(2)[4] of the ILSA.

_____

[2] Paragraph 13 provides: "Nothwithstanding the foregoing, if the default alleged by Buyer is with respect to Seller's substantial completion obligation set forth in paragraph 7 above, Seller shall not be entitled to the curative period described above to the extent that same would be deemed to extend Seller's completion obligation in a manner which would not be permitted if the exemption of this sale from the Interstate Land Sales Full Disclosure Act pursuant to 15 U.S.C. § 1702(a)(2) is to apply."

[3] Because the Court concludes that the Initial Contract is exempt from the ILSA under § 1702(a)(2), there is no need to discuss the issue of whether Plaintiff's claim is time-barred or the applicability of either equitable tolling or equitable estoppel.

[4]         (d) Additional authority for revocation of nonexempt contract or
              agreement at option of purchaser or lessee; time limit; applicability

Any contract or agreement which is for the sale or lease of a lot not exempt under

13

Section 1703(d)(2), however, only applies to contracts not exempt under § 1702.  Because the

Court has concluded that the Initial Contract is exempt from the ILSA under 15 U.S.C. §

1702(a)(2), *see supra*, Plaintiff's claim that the Initial Contract violated § 1703(d)(2) must also

fail.  Plaintiff's claim in Count I alleging a violation of § 1703(d)(2) with respect to the Initial

Contract are also **DISMISSED WITH PREJUDICE.**[5]

(iii). 1703(d)(2) - Revised Contract

 Count I of the Amended Complaint also alleges that the Revised Contract violates §

1703(d)(2) of the ILSA.  (Am. Compl. ¶ 49b). As set forth above, § 1703(d)(2) allows a buyer to

revoke a *non-exempt* contract, that does not provide the buyer the opportunity to remedy a default

or breach of the contract "within twenty days after the date of the receipt of such notice."   With

regard to curing a default, paragraph 13 of the Revised Contract states, "If Buyer is still in default

twenty (20) days after Seller sends Buyer notice thereof, Seller shall be entitled to the remedies

provided herein."  Because the Revised Contract allows the buyer only twenty days from the date

seller *sends* the buyer notice of default rather than twenty days from the dated seller *receives* such

notice, the language of the Revised Contract can support a claim for a violation of § 1703(d)(2).

The question of whether the difference between the statutory language and the language of the

_____

section 1702 of this title and which does not provide--
. . .
(2) that, in the event of a default or breach of the contract or agreement by the
purchaser or lessee, the seller or lessor (or successor thereof) will provide the
purchaser or lessee with written notice of such default or breach and of the
opportunity, which shall be given such purchaser or lessee, to remedy such default
or breach within twenty days after the date of the receipt of such notice; and . . .

[5] Because the Court concludes that the Initial Contract is exempt from the ISLA under §
1702(a)(2), there is no need to discuss the issue of whether the claim is time-barred or the
applicability of either equitable tolling or equitable estoppel.

contract is material, and the question of whether the difference actually affected the exercise of

Plaintiff's rights cannot be resolved on a motion to dismiss.

   *a. Statute of limitations*

   Defendants argue that Plaintiff's § 1703(d)(2) claims are time-barred because they were

brought more than two years (but less than three years) after the Contracts at issue were signed.

The ILSA sets forth different limitations periods applicable to different types of violations. See

15 U.S.C. §§ 1703(c)[6], 1711[7].  Subsection 1703(d) provides a two-year limitations period for

revocation of the contract at the buyer's option for failure to comply with § 1703(d) of the ILSA.

Thus, upon a review of the face of the Amended Complaint, Plaintiff's revocation claim under §

1703(d) is time-barred.  However, courts have held that the limitations period is subject to

_____

   [6] 15 U.S.C. 1703(c) provides:
(c) Revocation of contract or agreement at option of purchaser or lessee where required property
report not supplied
In the case of any contract or agreement for the sale or lease of a lot for which a property report is
required by this chapter and the property report has not been given to the purchaser or lessee in
advance of his or her signing such contract or agreement, such contract or agreement may be
revoked at the option of the purchaser or lessee within two years from the date of such signing,
and such contract or agreement shall clearly provide this right. (emphasis added)

   [7] 15 U.S.C. 1711 provides:
(a) Section 1703(a) violations
No action shall be maintained under section 1709 of this title with respect to-
(1) a violation of subsection (a)(1) or (a)(2)(D) of section 1703 of this title more than three years
after the date of signing of the contract of sale or lease; or
(2) a violation of subsection (a)(2)(A), (a)(2)(B), or (a)(2)(C) of section 1703 of this title more
than three years after discovery of the violation or after discovery should have been made by the
exercise of reasonable diligence.
(b) Section 1703(b) to (e) violations
No action shall be maintained under section 1709 of this title to enforce a right created under
subsection (b), (c), (d), or (e) of section 1703 of this title unless brought within three years after
the signing of the contract or lease, notwithstanding delivery of a deed to a purchaser.

equitable tolling. See Happy Inv. Group v. Lakeworld Prop., Inc., 396 F.Supp. 175, 188
(N.D.Cal.1975).  In addition, the doctrine of equitable estoppel may prevent a defendant from
relying on a statute of limitations defense even though the limitations period has run. See Bomba
v. W.L. Belvidere, Inc., 579 F.2d 1067 (7th Cir. 1978) (holding that the doctrine of equitable
estoppel may apply in suits brought under the ILSA); Hadad v. Deltona Corp., 535 F.Supp. 1364,
1368 (D.N.J. 1982).

        "[E]quitable tolling is an extraordinary remedy that obliges plaintiffs to satisfy their
burden of showing 'extraordinary circumstances' that are both beyond their control and
unavoidable even with diligence." Taylor v. Holiday Isle, LLC, 561 F.Supp.2d 1269, 1276 (S.D.
Ala. 2008). Plaintiff's Amended Complaint has not alleged "extraordinary circumstances" which
would warrant equitable tolling of the two-year limitations period for seeking rescission periods
set forth in § 1703(a) and 1703(d). See Happy, 396 F. Supp. at 188 (stating that in order to
successfully toll the ILSA, plaintiffs must make a showing that the defendants concealed from
plaintiffs the basic facts forming a cause or action and that the plaintiffs were in ignorance of the
facts through no fault of their own) (citing Baker v. F. & F. Investment, 420 F.2d 1191 (7th
Cir.1970)).  Plaintiff argues that Defendants should not be heard now to complain that Plaintiff
did not notify it within the two-year time frame for rescission because Defendants failed to
include the two-year rescission period in the contract, in violation of  § 1703(c).  That argument
has been rejected by other courts. See Taylor, 561 F. Supp.2d at 1275 (holding a developer's
failure to provide notice of the right of rescission in a purchase agreement does not eliminate the
two-year requirement for rescission).

        Additionally, Plaintiff has not alleged sufficient facts which would allow the application

of equitable estoppel.  Plaintiff has not alleged that he knew the basis for his suit before the limitation period ended but that Defendants induced him to forego the suit until now.  See Aboujaoude v. Poinciana Development Co. II, 509 F. Supp.2d 1266 (S.D. Fla. 2007) ("Equitable estoppel arises where the parties recognize the basis for suit, but the wrongdoer prevails upon the other to forego enforcing his right until the statutory time has lapsed.") (citations omitted).

Plaintiff shall be allowed the opportunity to amend his complaint to allege, if it can do so in good faith, allegations which would support the application of either equitable tolling, equitable estoppel, or both.  Thus, Plaintiff's claim for rescission of the Revised Contract for failure to comply with § 1703(d) of the ILSA is **DISMISSED WITHOUT PREJUDICE**, with leave to amend consistent with this Order.[8]

(iv). § 1703(a)(2)(A), (B), and (C)

Count I of the Amended Complaint also alleges that the Revised Contract violates § 1703(a)(2)(A), (B), and (C) of the ILSA. (Am. Compl. ¶ 49).  Plaintiff claims these provisions are violated because the Revised Contract was used as part of a scheme to commit crimes and deceive purchasers. (Am. Compl. ¶ 49a).

The scheme Plaintiff alleges Defendants employed to deceive purchasers essentially is as follows: In order for Defendants to market their property, they knew that under ILSA they had to either register with the Secretary of HUD and comply with all of the requirements associated

---

[8] To the extent Plaintiff may be seeking general relief under § 1709(b), as opposed to rescission or revocation, the claims would not be time-barred because there is a three year limitations period. § 1711. It is not clear from the Amended Complaint whether Plaintiff is seeking general relief for any of the alleged violations of the ISLA.  To the extent Plaintiff is seeking general relief under § 1709 for any of the alleged violations, he may assert them in his next amended complaint.  However, he is instructed to delineate the claims in separate counts.

with that registration (i.e. filing a statement of record and preparing a property report, 15 U.S.C. §§ 15 1703 – 1707) or they had to exempt themselves from the requirements of the ILSA.   One way to be exempt was for Defendants to obligate themselves contractually to complete construction of the residences within 2 years of the signing of the contract.  If Defendants registered with HUD, they would not have to obligate themselves to complete construction within 2 years.

When Defendants presented Plaintiff with the Initial Contract, they were in the process of registering the residential project with HUD.  Defendants never intended to complete construction of Plaintiff's residence within 2 years.  Rather, Defendants sought to induce Plaintiff into purchasing the property by falsely representing to him that they would complete construction within 2 years, knowing that once they finalized their registration with HUD, they would falsely claim that their lender required a new form of contract.  Defendants would then induce Plaintiff to sign the new contract based upon false representations and omissions, which contract eliminated the 2 year completion requirement.  Plaintiff also claims Defendants did not provide a property report before signing the Initial Contract, but should have because they did not intend to complete construction within 2 years. (Am. Compl. ¶ ¶ 30 - 37, 48, 49c.).

As an initial matter, the Court rejects Plaintiff's claim that Defendants were required by § 1703(a)(1)(B) of the ILSA to provide a property report before Plaintiff signed the Initial Contract.  As the Court ruled previously, the Initial Contract, as a matter of law, is exempt from the ILSA under 15 U.S.C. § 1702(a)(2).  Thus, Defendant was not obligated to provide a property report prior to Plaintiff signing the Initial Contract.  Accordingly, Plaintiff's claim in Count I that the Revised Contract violated § 1703(a)(1)(B) because Defendant did not provide a property

18

report before Plaintiff signed the Initial Contract is hereby **DISMISSED WITH PREJUDICE.**

Plaintiff also alleges that Defendants' actions and representations in inducing Plaintiff to sign the Revised Contract, as described above, violated § 1703(a)(2)(A), (B), and (C) of the ILSA.[9]  Those provisions prohibit fraud, deceit and misrepresentation in connection with a sale or offer to sell a lot not exempt under 1702(a).  See Rice v. Branigar Organization, Inc., 922 F.2d 788, 792 (11th Cir. 1991) (calling  § 1703(a)2 "the ISLA anti-fraud provision").

The facts alleged in the Amended Complaint, assumed to be true for purposes of this motion, state a claim for violations of § 1703(a)(2)(A), (B), and (C) of the ILSA.   Defendants, however, argue that these claims fail because the merger clause in the Revised Contract precludes Plaintiff from proving reliance on the prior version of the agreement.  Defendants rely on Garcia v. Santa Maria Resort, Inc., 528 F. Supp.2d 1283 (S.D.Fla. 2007) for the proposition that a merger clause in the operative agreement precludes Plaintiff from claiming  reasonable reliance on prior misrepresentations.  In Garcia, the court held that the plaintiffs could not have reasonably relied on any alleged oral misrepresentations made to them before they signed agreements to purchase preconstruction condominium units because "[r]eliance on fraudulent

---

[9](a) Prohibited activities
It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails--
(2) with respect to the sale or lease, or offer to sell or lease, any lot not exempt under section 1702(a) of this title--
    (A) to employ any device, scheme, or artifice to defraud;
    (B) to obtain money or property by means of any untrue statement of a material fact, or any omission to state a material fact necessary in order to make the statements made (in light of the circumstances in which they were made and within the context of the overall offer and sale or lease) not misleading, with respect to any information pertinent to the lot or subdivision;
    (C) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a purchaser;

representations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement." Id. at 1295 (quoting Eclipse Med., Inc. v. Am. Hydro-Surgical Instruments, Inc., 262 F. Supp.2d 1334, 1342 (S.D. Fla.1999). See also Weaver v. Opera Tower, LLC, 2008 WL 4145520, *2 (S.D. Fla. 2008) ("Within this context, it is well-settled that a contracting party may not, as a matter of law, reasonably rely upon prior written or oral misrepresentations expressly contradicted by a subsequent written agreement.).

The cases relied upon by Defendants are distinguishable because the claims in those cases were directly and expressly rebutted by the contracts. See Indulgence Yacht Charters Ltd. v. Ardell Inc., 2008 WL 4346749, *7 (S.D. Fla. 2008).  Here, Plaintiff alleges that Defendants engaged in fraudulent practices and made fraudulent misrepresentations with regard to Defendants' purpose and intentions for requesting that Plaintiff sign a Revised Contract. (Am. Compl. ¶ 32, 33, 34, 48).  In this case, the alleged fraud and misrepresentations are not directly and expressly rebutted by the contracts.  Thus, Garcia's holding does not apply to this case. Plaintiff has stated sufficient facts to support his claim in Count I pursuant to § 1703(a)(2)(A), (B) and (C) of the ILSA.

Finally, in Count I, Plaintiff alleges that Paragraph 11[10] of both Contracts include

_____

[10] 11.  Additional Costs and Development Fee. Buyer understands and agrees that, in addition to the Purchase Price for the Unit, Buyer must pay certain other fees, costs or other sums when the title is delivered to Buyer at closing.  These include:
(a) A "development fee" equal to one and one half percent (1.50%) of the Purchase Price (and of any charges for options or extras now or hereafter contracted for which are not included in the Purchase Price).  This fee will be used, in part, to pay for the following costs: (i) the costs of officially recording the deed. . . (ii) the documentary stamp taxes . . .  and (iii) the premium on the owner's title insurance policy, at the minium promulgated risk rates promulgated by the Florida Insurance Commissioner (taking into account applicable reissue rates and new home

fraudulent and misleading statements with regard to cost of title insurance in violation of

1703(a)(2)(A), (B) and (C).[11]  The Court rejects Plaintiff's claim as to the Initial Contract, as it

was exempt from the ILSA, *see supra,* but analyzes Plaintiff's allegations with respect to the

Revised Contract.

      Plaintiff alleges that Defendants' use of the word "minimum" suggests to purchasers that

seeking title insurance at a lower cost will not result in any savings. (Am. Comp. ¶ 65).  Further,

Plaintiff alleges that the way Defendants have classified the costs as a development fee, any

savings that might be had would inure to the seller.  (Am. Comp. ¶ 65).  Thus, reading the

contract as a whole, Plaintiff claims that the buyer is led to believe title insurance cannot be

purchased at a lower price elsewhere and, if a lower price could be obtained, it would inure to the

benefit of the seller. (Am. Comp. ¶ 65). Plaintiff relies on the Florida Supreme Court case of

Chicago Title Insurance Company v. Butler, 770 So.2d 1210 (Fla. 2000), for the proposition that

the law does not promulgate a "minimum rate." (Am. Comp. ¶ 65).  Thus, "Defendants'

_____

credits, if any), whether obtained from Seller's closing agent, or elsewhere.  The balance of the
"development fee" shall be retained by Seller to provide additional revenue and to offset certain
of its construction and development expenses, including without limitation, certain of Seller's
administration expenses and Seller's attorneys' fees in connection with development of the
Condominium.  Accordingly, Buyer understands and agrees that the development fee is not for
payment of closing costs or settlement services (other than tot the extent expressly provided
above), but rather represents additional funds to Seller which are principally intended to provide
additional revenue and to cover various out-of-pocket and internal costs and expenses of Seller
associated with development of the Condominium.  In the event of increases in either the
recording fees imposed by the County, the documentary stamp tax rates or the minimum risk title
insurance premium, subsequent to the date of this Agreement, or in the event of the imposition of
any surcharge or any new governmental tax or charge on deeds or conveyances, Buyer agrees to
pay all such increases, surcharges or new taxes or charges, in addition to the development fee. . . .

    [11]Plaintiff's allegations of fraudulent and misleading statements with regard to the cost of
title insurance also form a basis for his claims in Count II for violation of Fla. Stat. Chapter 718
and in Count III for violation of the FDUTPA.

customers are charged more than the cost of the policy rendering Defendants' representation

untrue." (Am. Comp. ¶ 62).

Other members of this court recently entertained and rejected nearly the identical

argument in similar cases. See Dolphin, LLC v. WCI Communities, Case No. 07-80241, *7-8

(S.D. Fla. Feb. 20, 2008); Infinity Global, LLC v. Resort at Singer Island, Inc., 2008 WL

1711535 (S.D. Fla. 2008). In Dolphin, the plaintiff argued that "a prospective purchaser could

have obtained a rate less than the amount promulgated by the Florida Department of Insurance

with a title company not affiliated with [defendant]." The court held that "there is nothing

misleading" about the purchase agreement's reference to the "minimum rate promulgated by the

Florida Department of Insurance."Id. at 8. Additionally, in Infinity Global, the court dismissed

the plaintiff's claim that he was "misled by the written contract into believing that the rate

charged by [Defendant's] affiliated business is the bare minimum available charge as allowed by

Department of Insurance." Id. at *3. As the Court held in Dolphin,

> First, it appears that Florida in fact continues to regulate title insurance rates. *See*
> Fla.. Stat. § 627.782(1) (requiring the Florida Insurance Commission to "adopt a
> rule specifying the premium to be charged in this state by title insurers for the
> respective types of title insurance contracts." The case relied upon by plaintiff for
> the proposition that  § 627.782 is no longer legally operative, *Chicago Title Ins.
> Co. V. Butler,* 770 So.2d 1210 (Fla. 2000), did not affect the statute requiring the
> Florida Insurance Commission to specify title insurance premiums. Rather, *Butler*
> held unconstitutional only statutes prohibiting title insurance agents from
> "negotiating or rebating to their clients any portion of the risk premium charged
> for the issuance of title insurance." *Id.* at 1213. Because *Butler* invalidated only
> those anti-rebate statutes, not  § 627.782, **there was nothing misleading about
> the agreement's reference to the "minimum rate promulgated by the Florida
> Department of Insurance."**

Id. at *8 (emphasis added). Moreover, in the instant case, the contract specifically states that the

balance of the 1.5% "development fee," will be retained by the seller to provide additional revenue and to offset certain of its construction and development expenses.  Hence,  Plaintiff's claim in Count I, that Paragraph 11 of the contracts include fraudulent and misleading statements with regard to cost of title insurance, in violation of § 1703(a)(2)(A), (B) and (C) is hereby **DISMISSED WITH PREJUDICE.**

_Count 2: The Florida Condominium Act_

(i).   § 718.506 - title insurance

Count II of the Amended Complaint alleges that Paragraph 11 of both Contracts include fraudulent and misleading statements with regard to cost of title insurance in violation of § 718.506, Fla. Stat.  This statute provides, in pertinent part:

> (1) Any person who, in reasonable reliance upon any material statement or information that is false or misleading and published by or under authority from the developer in advertising and promotional materials, including, but not limited to, a prospectus, the items required as exhibits to a prospectus, brochures, and newspaper advertising, pays anything of value toward the purchase of a condominium parcel located in this state shall have a cause of action to rescind the contract or collect damages from the developer for his or her loss prior to the closing of the transaction.

As explained above, there was nothing misleading about the agreement's reference to the "minimum rate promulgated by the Florida Department of Insurance." See Dolphin, Case No. 07-80241 at *7-8; Infinity Global, 2008 WL 1711535.   Additionally, the statutory language of § 718.506 requires reliance.  See Fla. Stat. § 718.506(1) ("Any person who, in reasonable reliance upon any material statement or information that is false or misleading . . . ") (emphasis added). Plaintiff does not allege that he relied on the allegedly misleading statement about title insurance in signing the contract.  Accordingly, Plaintiff's claim in Count II alleging violation of § 718.506, Fla. Stat. in connection with Paragraph 11of the Revised Contract's reference to the cost of title

23

insurance is hereby **DISMISSED WITH PREJUDICE**.[12]

(ii).   § 718.506 - entering into the Revised Contract

Plaintiff alleges that Defendants' deceptive use of the Initial and Revised Contracts to evade the ILSA, which involved publishing misleading statements in the exhibits attached to the prospectus, and in the June 20, 2005 letter, constitute a violation of § 718.506. (Am. Compl. ¶ 67); *see also* pp. 17-18, *supra.*

Defendants move to dismiss this claim, arguing that Plaintiff fails to allege any materially false or misleading statements in the Prospectus or June 2005 Letter that are not negated by the clear terms of the Revised Contract.  Defendants rely on the Revised Contract's merger clause to support its position that Plaintiff's claims are precluded because the alleged misrepresentations occurred prior to Plaintiff signing the Revised Contract. See <u>Garcia</u>, 528 F.Supp.2d at 1295 ("[R]eliance on fraudulent misrepresentations is unreasonable as a matter of law where the alleged misrepresentations contradict the express terms of the ensuing written agreement.").

Section 718.506 governs representations made to buyers prior to entering into a purchase agreement. <u>Gentry v. Harborage Cottages-Stuart, LLLP</u>, Slip Copy, 2008 WL 1803637 *3 (S.D. Fla. 2008). The requisite analysis does not require reference to the agreement itself except to ensure that the alleged misrepresentation does not contradict an express term of the agreement. <u>Id.</u>

Contrary to Defendants' contention, the Revised Contract does *not* contradict the alleged misrepresentations upon which Plaintiff relies.  Thus, <u>Garcia</u>'s holding that the merger clause

---

[12]  Granting Plaintiff leave to amend to allege reliance would be futile because the contract provision in question is not misleading as a matter of law.

renders reliance upon prior misrepresentations unreasonable, as a matter of law, does not apply to the facts of this case.  Plaintiff's allegation of misrepresentation with regard to Defendants' purpose and intentions for requesting that Plaintiff execute the Revised Contract are not, as a matter of law, contradicted by the express terms of the Revised Contract.  Thus, Plaintiff has stated sufficient facts to support his claim in Count II alleging violation of § 718.506, Fla. Stat. relative to the Revised Contract .

  (iii).   § 718.503, 718.504 - management contract

  Plaintiff alleges that Defendants did not provide him with a copy of the management contract until October, 2007. (Am. Compl. ¶ 71.) Plaintiff alleges that Defendants violated § 718.504(11) by failing to include a copy of the contemplated contract in the prospectus.  (Am. Compl. ¶ 69-71.)   However, only management contracts that are "proposed or existing" must be disclosed in the prospectus. See § 718.504(11)(e).  Here, Plaintiff does not allege that the management contract was proposed or in existing at the time the prospectus was presented. Accordingly, Plaintiff's claim in Count II, alleging a violation of § 718.504(11), Fla. Stat. for failure to include a copy of the management contract in the prospectus, is hereby **DISMISSED WITHOUT PREJUDICE** with leave to amend.

  Plaintiff also alleges that he had the right under Florida Statute § 718.503(1)(b)[13] to

---

[13]§ 718.503(1)(b) states, in pertinent part:
(b) Copies of documents to be furnished to prospective buyer or lessee.--Until such time as the developer has furnished the documents listed below to a person who has entered into a contract to purchase a residential unit or lease it for more than 5 years, the contract may be voided by that person, entitling the person to a refund of any deposit together with interest thereon as provided in s. 718.202. **The contract may be terminated by written notice from the proposed buyer or lessee delivered to the developer within 15 days after the buyer or lessee receives all of the documents required by this section.** The developer may not close for 15 days following the execution of the agreement and delivery of the documents to the buyer as evidenced by a signed

rescind the Revised Contract within fifteen days of his receipt of the management contract. (Am. Compl. ¶ 68, 77.)  Defendants move to dismiss, arguing that the management contract does not constitute a material and adverse change. See Response at 11-12.  Defendant appears to rely on § 703(1)(a)(1), which provides, in relevant part, that all contracts for the sale of a condominium unit shall contain the following language:

> THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER.

Defendant's argument is misplaced.  The plain language of § 718.503(1)(b) does not restrict the 15-day rescission period to a material amendment.[14]  Rather, § 718.503(1)(b) states that "[t]he contract may be terminated by written notice from the proposed buyer or lessee delivered to the developer within 15 days after the buyer or lessee receives all of the documents required by this

---

receipt for documents unless the buyer is informed in the 15-day voidability period and agrees to close prior to the expiration of the 15 days. The developer shall retain in his or her records a separate agreement signed by the buyer as proof of the buyer's agreement to close prior to the expiration of said voidability period. Said proof shall be retained for a period of 5 years after the date of the closing of the transaction. The documents to be delivered to the prospective buyer are the prospectus or disclosure statement with all exhibits, if the development is subject to the provisions of s. 718.504, or, if not, then copies of the following which are applicable:

> 5. The management contract, maintenance contract, and other contracts for management of the association and operation of the condominium and facilities used by the unit owners having a service term in excess of 1 year, and any management contracts that are renewable.

(emphasis added).


[14]     Even if Plaintiff was required to allege that the late-supplied management contract was a material adverse amendment, Plaintiff meets that burden in the Amended Complaint. Plaintiff alleges that failure to provide the management contract was prejudicial to Plaintiff. (Am. Compl. ¶ 76.)

section." The management contract is one of the documents which is required by the statute to be provided to the purchaser. See § 718.503(1)(b)(5). Plaintiff alleges that he delivered notice he was canceling the contract less than 15 days after delivery of the management contract. (Am. Compl. ¶ 78.) Accordingly, Plaintiff has stated sufficient facts to support his claim in Count II for rescission stemming from the alleged violation of § 718.503(1)(b), Fla. Stat.[15]

      (iv).  § 718.503 - changes in the estimated budget

In his Opposition to the Motion to Dismiss (DE 23) Plaintiff waived his claim in Count II relating to the change to the prospectus that stated "changes in the estimated budget are not substantial or material for the purpose of the purchaser's right to cancel within 15 days." As a result, Plaintiff's claim under § 718.503 relating to that statement is hereby **DISMISSED WITH PREJUDICE.**

*Count 3: FDUTPA*

Defendants move to dismiss Count III of the Amended Complaint, which alleges deceptive and unfair trade practices. Plaintiff alleges that Defendants' reference to the "minium promulgated risk rates" in connection with the title insurance policy violates the FDUTPA "because Defendants knew and concealed the intent to charge and profit more by providing such insurance." (Am. Compl. ¶ 83). The FDUTPA is designed to protect consumers from "unconscionable, deceptive, or unfair acts or practices" of trade and commerce. Fla. Stat. §

---

[15]Defendants submitted, as supplemental authority, an October 24, 2008 Order Denying Plaintiff's Motion for Summary Judgment on Count I of the Amended Complaint in Duthler v. Singer Island Condominiums, Ltd., et al, 08-cv-80693-DMM. Unlike the present case, that opinion was decided at summary judgment. Here, at the motion to dismiss stage, the Court cannot conclude, as a matter of law, that this section has not been violated. Therefore, it would be premature to rule that Plaintiff's allegations under § 718.503(1)(b), Fla. Stat. are barred by the analysis in the Duthler order.

501.202(2). The FDUTPA declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts of practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).  "Although not specifically identified in the statute, there are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: 1) a deceptive act or unfair practice; 2) causation; and 3) actual damages."  KC Leisure, Inc. v. Haber, 972 So.2d 1069, 1073 (Fla. 5th DCA 2008).

As explained above, there was nothing misleading about the agreement's reference to the "minimum rate promulgated by the Florida Department of Insurance." See Dolphin, Case No. 07-80241, *7-8; Infinity Global, 2008 WL 1711535.  Second, Plaintiff does not allege that he relied on the allegedly misleading statement in signing the contract.  "This itself is fatal to Plaintiff's claim because a FDUTPA claim must allege that the deceptive act or unfair practice actually caused plaintiff's claimed damages." Dolphin, Case No. 07-80241 at *8; KC Leisure, 972 So.2d at 1073 (plaintiff properly pled under the FDUTPA that, plaintiff, in reliance on Defendant's misinformation, was induced to pay money to purchase a franchise); Prohias v. AstraZeneca Pharmaceuticals, L.P., 958 So.2d 1054, 1056 (Fla.3d DCA 2007); (holding that plaintiff's failure to allege that Defendants' alleged wrongs caused her to purchase the offending product is an independent basis for dismissal of her FDUTPA claim).

Because the Court has concluded that the purchase agreement's reference to the Minimum rate promulgated by the Florida Department of Insurance" was not misleading, Plaintiff's claim in Count III alleging violation of the FDUTPA is hereby **DISMISSED WITH**

**PREJUDICE**.[16]

*Count 4: Fraud in the Inducement*

Plaintiff's fraudulent inducement claim is predicated on the same allegations as his fraud claims in Count I under § 1703(a)(2) of the ILSA.  The elements of fraud in the inducement in Florida are: 1) that the defendant misrepresented a material fact, 2) that the defendant knew or should have known that the statement was false, 3) that the defendant intended the representation would induce the plaintiff to enter into a contract or a business relation; and 4) that the plaintiff was injured by acting in justifiable reliance on the misrepresentation.  Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc., 262 F.Supp. 2d 1334, 1342 n. 1 (S.D. Fla. 1999).

Plaintiff alleges that he was fraudulently induced to enter into both the Initial Contract and the Revised Contract.  The Court will consider each claim separately.

(i) Initial Contract

With regard to the Initial Contract, Plaintiff alleges that he was fraudulently induced to enter into the Initial Contract by Defendants' misrepresentation that they would complete construction within two years.  Plaintiff alleges that Defendants failed to disclose that they never intended to complete construction within two years.  Accepting all the allegations in the Amended Complaint as true, the elements are met:  (1) Defendants promised to complete construction within two years.  A promise of future conduct made with the positive intent not to perform will satisfy the misrepresentation element.  Royal Typewriter Co. v. Xerographic Supplies Corp., 719 F.2d 1092, 1104 (11th Cir.1983). (2) Defendants never intended to comply

---

[16]   Granting Plaintiff leave to amend to allege reliance would be futile because the contract provision in question is not misleading as a matter of law.

with their promise to complete construction within two years; (3) Defendants intended their promise to induce Plaintiff to enter into the Initial Contract; and (4) Plaintiff was injured by entering into the Initial Contract. Plaintiff alleges that he was damaged by being deprived of his deposit money and the use thereof and that he suffered injury because the value of the property was diminished by a later completion date.

Defendants argue that Plaintiff fails to state a cause of action because the Initial Contract was abrogated and extinguished through the Revised Contract's merger clause when Plaintiff signed the Revised Contract. See Aly Handbags, Inc. v. Rosenfeld, 334 So.2d 124, 126 (Fla. 3d DCA 1976) ("The well established rule of law is that a contract may be discharged or extinguished by merger into a later contract entered into between the parties in respect to the same subject which replaces the original contract."). That principle, however, is not applicable here. In this claim, Plaintiff is not seeking to enforce the provisions of the Initial Contract the provisions of which, according to Defendants, have been extinguished by the execution of the Revised Contract. Rather, Plaintiff is suing in tort for fraud in the inducement, the elements of which do not require reliance upon the terms of the contract. See J. Square Enters. v. Regner, 734 So.2d 565, 566-67 (Fla. 3d DCA 1999)(fraudulent inducement is an independent tort that requires proof of facts separate and distinct from breach of contract). Furthermore, according to the allegations of the amended complaint, Defendants knew before the execution of the Initial Contract that they intended to substitute the Revised Contract as part of their fraudulent scheme. Assuming those allegations to be true, Defendants cannot rely upon the provisions of the Revised Contract which is alleged to have been procured as an integral part of the fraud to avoid liability.

Accordingly, Plaintiff has stated sufficient facts to support his claim in Count IV alleging

fraudulent inducement into entering the Initial Contract by Defendants' misrepresentation that they would complete construction within two years.

(ii) Revised Contract

Finally, Plaintiff alleges that he was also fraudulently induced into entering the Revised Contract.  Accepting the allegations in the Amended Complaint as true, the elements are met:

(1) Defendants misrepresented a material fact:  Defendants represented that the Revised Contract was required to make the contract compliant with HUD regulations at the lender's request.  Defendants also presented the change in a manner intended to lead Plaintiff to believe the lender's request came after the date the Initial Contract was signed.

(2) Defendants knew or should have known that the statement was false: Defendants had applied for and received HUD's registration approval one week before Plaintiff had signed the Initial Contract.  Defendants failed to advise Plaintiff that the lender's requirement for using the new form of contract was known to Defendants prior to contracting with Plaintiff.  Rather, Defendants cast it as though the lender's requirement  had occurred after the Initial Contract was signed.

(3) Defendants intended the misrepresentations and omissions would induce Plaintiff to enter into the Revised Contract.

(4) Plaintiff was injured by acting in justifiable reliance on the misrepresentation: Plaintiff alleges that he was damaged by being deprived of his deposit money and the use thereof.

Defendants move to dismiss this fraudulent inducement claim, arguing that any representations made prior to the execution of the Revised Contract are not actionable because of the merger doctrine.  Defendants' argument is misplaced.  Since it is alleged that the

31

misrepresentations were made to induce Plaintiff to enter into the Revised Contract, the fraudulent inducement claim is separate from the contract and the merger doctrine is not applicable.

Defendants also argue that the alleged misrepresentations are not material and thus cannot form the basis of a fraudulent inducement claim.  Defendants rely on Billian v. Mobil Corp., 710 So.2d 984, 987 (Fla. 4th DCA 1998) and Spitale v. Smith, 721 So.2d 341 (Fla. 2 DCA 1998), which require that the materiality of a fact be determined objectively by whether it affects the value of the property.  Those holdings, however, relate to a different cause of action entirely, namely, fraudulent nondisclosure of a condition of property under Johnson v. Davis, 480 So.2d 625 (Fla.1985), i.e. an undisclosed roof defect.  Those cases do not stand for the proposition that false and misleading misrepresentations or omissions that, in and of themselves, have no economic effect on a transaction, but which induce one to enter into a contract, cannot be material.  Whether the representations and omissions upon which Plaintiff relies are material cannot be resolved on a motion to dismiss.  Plaintiff has stated sufficient facts to support his claim in Count IV alleging fraudulent inducement.[17]

**Conclusion**

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendants'

---

[17] Plaintiff's also claims that he was fraudulently induced based on Defendants' failure to disclose Plaintiff's ability to elect to cancel or enforce the Initial Contract.  See Am. Compl. ¶ 89. Plaintiff's allegation that Defendants' failed to disclose Plaintiff's ability to elect to cancel or enforce the Initial Contract is without merit, as it is negated by the plain language of the Initial Contract.  Paragraph 25 of the Initial Contract explicitly provides, in large, bold type, that Plaintiff has a right to cancel the contract within fifteen days of the date of execution and within fifteen days of any materially adverse modification to the offering.  Nonetheless, for the reasons explained above, Plaintiff has sufficiently pled his fraudulent inducement claims as to both the Initial Contract and the Revised Contract.

Motion to Dismiss (DE 17) is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Plaintiff's claim in Count I that the Initial Contract violated § 1703(a)(1)(B) is hereby **DISMISSED WITH PREJUDICE.**

2. Plaintiff's claim in Count I alleging violation of § 1703(d)(2) with respect to the Initial Contract is hereby **DISMISSED WITH PREJUDICE.**

3. Plaintiff's claims in Count I alleging violation of § 1703(d)(2) with respect to the Revised Contract are hereby **DISMISSED WITHOUT PREJUDICE** with leave to amend, consistent with this Order.

4. Plaintiff's claim in Count I that the Revised Contract violated § 1703(a)(1)(B) because Defendant did not provide a property report before Plaintiff signed the Initial Contract is hereby **DISMISSED WITH PREJUDICE.**

5. Plaintiff has stated sufficient facts to support his claim in Count I pursuant to § 1703(a)(2)(A), (B), and (C) of the ILSA.

6. Plaintiff's claim in Count I that Paragraph 11 of the contracts include fraudulent and misleading statements with regard to cost of title insurance in violation of § 1703(a)(2)(A), (B), and (C) is hereby **DISMISSED WITH PREJUDICE.**

7. Plaintiff's claim in Count II alleging violation of § 718.506, Fla. Stat. in connection with Paragraph 11of the Revised Contract's reference to the cost of title insurance is hereby **DISMISSED WITH PREJUDICE**.

8. Plaintiff has stated sufficient facts to support his claim in Count II alleging violation of § 718.506, Fla. Stat. relative to allegedly  misleading Plaintiff about the purpose of the Revised Contract.

33

9. Plaintiff's claim in Count II alleging violation of § 718.504(11), Fla. Stat. relative to the management contract in the prospectus is hereby **DISMISSED WITHOUT PREJUDICE** with leave to amend to allege that the management contract was proposed or in existence at the time the prospectus was presented, if Plaintiff can so allege.

10. Plaintiff has stated sufficient facts to support his claim in Count II alleging violation of § 718.503(1)(b), Fla. Stat. relative to rescission within fifteen days of the receipt of the management contract.

11. Plaintiff's claim in Count II relative to the statement in the prospectus that "changes in the estimated budget are not substantial or material for the purpose of the purchaser's right to cancel within 15 days" violated § 718.503 is hereby **DISMISSED WITH PREJUDICE.**

12.  Plaintiff's claim in Count III alleging violation of the FDUTPA is hereby **DISMISSED WITH PREJUDICE**.

13. Plaintiff has stated sufficient facts to support his claim in Count IV alleging fraudulent inducement relative to the Initial Contract.

14. Plaintiff has stated sufficient facts to support his claim in Count IV alleging fraudulent inducement into entering the Revised Contract.

Going forward, Plaintiff is hereby advised to only plead one cause of action per count, rather than relying on the Court to disentangle the multiple claims contained in single counts.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 19th day of February, 2009.

_____
KENNETH A. MARRA
United States District Judge

Copies furnished to Counsel of Record

34